UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WAYNE CHARLES, SR. )<br><br>Plaintiffs, )<br><br>v. )<br><br>LEVITT & KAIZER, RICHARD LEVITT; )<br>NICHOLAS KAIZER; BRENDAN WHITE;)<br>GLENDA CHARLES; )<br>MICHELLE KERN-RAPPY, )<br>LEE POLLOCK, THE STATE )<br>OF NEW YORK, THE BANK OF NEW )<br>YORK MELLON CORPORATION, )<br>PAUL A. SHNEYER, individually and in his)<br>Capacity as the court appointed receiver of )<br>the Premises located at 80 West 120th Street, )<br>New York, New York 10027 )<br><br>Defendants. )<br> ) | | Civil Action No. 15-9334 |

## AMENDED VERIFIED COMPLAINT FOR
## INJUNCTIVE AND OTHER RELIEF
## JURY TRIAL DEMANDED

Plaintiff(s) as and for their Verified Complaint by their attorney, J.A. Sanchez-Dorta,

complaining of the Defendants LEVITT & KAIZER, RICHARD LEVITT, NICHOLAS

KAIZER, BRENDAN WHITE, GLENDA CHARLES, MICHELLE KERN-RAPPY, and

PAUL A. SHNEYER, individually, and in his capacity as the court appointed receiver of

the Premises located at 80 West 120th Street, New York, New York 10027, allege as

follows with all allegations stated upon information and belief:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 18 U.S.C. §§ 1961, 1962, 1964 28 U.S.C. § 1332, and 42 U.S. Code § 1983.

2. Jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367.

3. Venue is proper in this Court based upon 28 U.S.C. §§ 1391 (b) and (c).

## PARTIES

4. At all times hereafter mentioned, Plaintiff WAYNE CHARLES (hereinafter, "Mr. Charles") was and still is an individual living in the Borough of Manhattan, New York City, in the State of New York.

5. Defendant Levitt & Kaizer (hereinafter, the "Levitt & Kaizer") is a law firm duly organized and operating pursuant to the Laws of the State of New York, with its place of business located in the Borough of Manhattan, in the State of New York.

6. Defendant Richard Levitt is an attorney licensed to practice law in the State of New York, with his place of business located in the Borough of Manhattan, in the State of New York, who is domiciled in the State of New York.

7. Defendant Nicholas Kaizer is an attorney licensed to practice law in the State of New York, with his place of business located in the Borough of Manhattan, in the State of New York, who is domiciled in the State of New York.

8. Defendant Brendan White is an attorney licensed to practice law in the State of New York, with his place of business located in the Borough of Manhattan, in the State of New York, who is domiciled in the State of New York.

9. Defendant Michelle Kern-Rappy is an attorney licensed to practice law in the State of New York, with his place of business located in the Borough of Manhattan, in the State of New York, who is domiciled in the State of New York.

10. Paul A. Shneyer, a Defendant in this action individually, and in his capacity as the court appointed receiver of the Premises located at 80 West 120th Street, New York, New York 10027, has a place of business located in the Borough of Manhattan, in the State of New York, who is domiciled in the State of New York.

11. Defendant Glenda Charles is an individual who is domiciled in the State of Jersey.

12. The Bank of New York Mellon Corporation, commonly referred to as BNY Mellon, is an American multinational banking and financial services corporation formed on July 1, 2007, as a result of the merger of The Bank of New York and Mellon Financial Corporation.

13. .Defendant Lee Pollock is an attorney licensed to practice law in the State of New York, with his place of business located in the County of Westchester, in the State of New York, who is domiciled in the State of New York

14. The State of New York is a state of the United States of America.

## FACTUAL BACKGROUND

1. On March 24th, 2009, at the tail end of Wayne Charles' federal criminal trial, at which he was represented by Defendant Richard Levitt, Defendant Mr. Levitt asked the Plaintiff, Mr. Charles, to accompany him to his office.

2. Mr. Charles accompanied Defendant Mr. Levitt to his office, went to the conference room of Defendant Mr. Levitt, and was presented with a document, which document Mr. Charles several years later discovered was an "Affidavit of

Confession of Judgment", that 6 years and 3 days later would be utilized by Defendants in the Motion for Receiver (as defined below) to force into receivership, and to be appointed receiver of, a property located at 80 West 120th Street, New York, New York 10027, Block 01718 Lot 0067 in the borough of Manhattan worth approximately $3 Million (the "Premises").

3. Defendant Mr. Levitt informed Mr. Charles that if he did not sign that document, Mr. Charles would be forced, at that late date, in the last few days of a three week long federal criminal trial, to locate a new attorney, which Mr. Charles understood would be virtually impossible to do.

4. Given his fear that Defendant Mr. Levitt would, in fact, be able to withdraw as Mr. Charles' counsel at that late date, Mr. Charles' reasonable fear that he would not be able to locate new counsel at such a late date, and the panicked state of mind that naturally accompanies the threat of incarceration, Mr. Charles did not resist Defendant Mr. Levitt's requests to sign the document presented to him.

5. Nevertheless, upon information and belief, given the late stage of the trial, Defendant Mr. Levitt would not have been permitted by the judge in the criminal trial to simply withdraw as counsel for Mr. Charles, and Defendant Mr. Levitt knew that he would not have been permitted by the judge in the criminal trial to simply withdraw as counsel for Mr. Charles.

6. Thus, Defendant Mr. Levitt knew the statement he had made to Mr. Charles regarding his ability to withdraw from representing him at his criminal trial was false, and Defendant Mr. Levitt knew that the statement he had made was false when he made that statement to Mr. Charles.

7. Moreover, Defendant Mr. Levitt knew that Mr. Charles was not aware that the statement Defendant Mr. Levitt made to him about his ability to withdraw at that late stage of the criminal trial was false, and knew that he would be easily misled by that statement into determining in error that it was in his best interest, in fact, that it was his only viable option to avoid incarceration, to sign the Affidavit of Confession of Judgment.

8. Moreover, Defendant Mr. Levitt knew that Mr. Charles was under extreme duress at the time he signed the Affidavit of Confession of Judgment, given the fact that he was facing potential incarceration at the time, and was at the tail end of an almost month long trial at which he was being represented by Defendant Mr. Levitt.

9. Defendant Mr. Levitt was aware of Mr. Charles' condition and took advantage of the same by forcing him to sign, against his best interest, the Affidavit of Confession of Judgment.

10. Moreover, Mr. Charles believes that Defendant Mr. Levitt overcharged Mr. Charles for his fees, given the amount indicated in the Affidavit of Confession of Judgment, $150,000 and the fees already collected by Defendant Mr. Levitt, approximately $130,000 (a total of $280,000).

11. Moreover, Defendant Mr. Levitt did not advise Mr. Charles of his right to have separate legal counsel advise him regarding the Affidavit of Confession of Judgment, which was required given the fact that, by his presentation of the same to Mr. Charles for his signature, he had developed an adverse interest to (or conflict of interest with) Mr. Charles.

12. Defendant Mr. Levitt knew that it was Mr. Charles' right to have separate legal counsel advise him regarding the Affidavit of Confession of Judgment before signing the same, and intentionally did not advise him of that right in order to ensure that Mr. Charles would sign the Affidavit of Confession of Judgment, which was against Mr. Charles' interest and which Mr. Charles was under no legal obligation to do.

13. Upon information and belief, at the time that Defendant Mr. Levitt forced Mr. Charles to sign the Affidavit of Confession of Judgment, Defendant Mr. Levitt had already been paid to represent Mr. Charles in the criminal trial in the amount of approximately $130,000.

14. Mr. Charles' first attorney in that criminal matter was named Paul Horowitz. However, when he discovered that Mr. Horowitz was not admitted to practice in the federal court in which his case was being heard, his matter was transferred to a partner in Mr. Horowitz' office, named Lou Alperin. Mr. Charles had then changed from Mr. Alperin to Gerald Lefcourt. Mr. Gerald Lefcourt subsequently transferred Mr. Charles' matter, along with a $130,000 retainer Mr. Charles had paid him, to Richard Levitt, whose office was located in his same building. Thus, Mr. Charles, through no fault of his own, had been forced to change attorneys several times and, thus, was particularly vulnerable to the threat of a change of attorney, and Defendant Mr. Levitt was aware of this vulnerability.

15. Mr. Charles did not sign any letter of engagement or retainer with Defendant Mr. Levitt which might have provided Defendant Mr. Levitt the right to the additional payment contemplated in the Affidavit of Confession of Judgment.

16. After Mr. Charles signed the Affidavit of Confession of Judgment, under duress and relying to his detriment on the misrepresentations knowingly made by Defendant Mr. Levitt, attorney Nicholas Kaizer, Defendant Mr. Levitt's partner at Defendant Levitt and Kaizer, walked into the room, took the Affidavit of Confession of Judgment from the room, went to another room upstairs, and then returned with a copy of the Affidavit of Confession of Judgment.

17. Subsequently, Mr. Charles determined that the document had been notarized by an individual named Brendan White, someone who he had never met, and who had never met him. Mr. Wayne Charles affirms that he never met the individual, Brendan White, who notarized his signature and, thus must assume that, since it was Defendant Mr. Kaizer who took that document from him, and then returned it to him, notarized, it was Defendant Mr. Kaizer who was involved in the notarization of this document by a person who Mr. Charles had never met, and who has never met him. Defendant Brendan White has sworn in an affirmations submitted to the New York Supreme Court that he is "an attorney admitted to practice in the Courts of New York" and states "categorically that I have never and would never notarize a signature for anyone – even someone I know, and I do not know Mr. Charles – without being physically present to witness the signing, because I am well aware that a Notary may not notarize a document the signing of which he or she did not witness". Nevertheless, Mr. Sanchez-Dorta has discovered that, in fact, Mr. White' Registration Status with the New York State Unified Court System indicates he is "delinquent". This demonstrates, at the very least, that Defendant Brendan White, who is not so fastidious with the

requisites of his registration status with the New York State Bar, may thus likely be not so fastidious with the requisites of notarization in New York State as he pretends to be and, thus, may very well have perjured himself, at the bequest of the Defendants Kaizer, Levitt and Pollock, in the affirmation submitted to the New York Supreme Court.

18. Thus, with this fraudulent notarization, Defendants Mr. Levitt and Mr. Kaizer rendered the document secured under duress and by fraud an Affidavit of Confession of Judgment which could be submitted to a court, entitling their firm to a payment whose obligation had not then been sufficiently established.

19. Mr. Charles left the office, and returned to finish the last few days of the criminal trial represented by Defendant Mr. Levitt, and was convicted.

20. It is Mr. Charles' opinion that he was convicted due to the substandard representation provided to him by Defendant Mr. Levitt.

21. For example, Mr. Charles recalls that, in an effort to force him to sign the document he would later discover was an Affidavit of Confession of Judgment, Defendant Mr. Levitt promised that he would call a number of witnesses in his defense, but he never called such witnesses.

22. Mr. Charles relates that Defendant Mr. Levitt did, in fact, call two witnesses, but these witnesses were irrelevant, as demonstrated by the fact that the Judge in the case, Judge Kenneth Karas, even seemed to make a joke about how irrelevant the witnesses were. One witness even provided his testimony by telephone.

23. Mr. Charles maintains that one key witness that Defendant Mr. Levitt failed to call was a fellow named Frank Farley, the Deputy Commissioner of the Mount

Vernon Urban Renewal Agency and then Chief of Staff to the Mayor of Mount Vernon, New York.

24. Mr. Charles subsequently discovered one possible reason Defendant Mr. Levitt had failed to call Mr. Farley as a witness.

25. Apparently, according to Mr. Charles, Defendant Mr. Levitt had represented Mr. Farley in a previous federal case.

26. Moreover, according to Mr. Charles, Defendant Mr. Levitt never made that previous representation known to Mr. Charles, but simply refused to call Mr. Farley as a witness.

27. According to Mr. Charles, Defendant Mr. Levitt never got a transcript in this case and, although he understands that, despite the payment to Mr. Lefcourt of $130,000, the financial constraints Mr. Charles was facing began to become an issue, the court reporter in the criminal case was kind enough to let them read the transcript at no cost to them, and Defendant Mr. Levitt still never made an effort to consult the transcript to assist him in his defense.

28. Moreover, according to Mr. Charles there was a need for a motion regarding "Honest Services" which would have helped to keep Mr. Charles from being incarcerated and Defendant Mr. Levitt simply failed to file that motion.

29. In addition, according to Mr. Charles, there was a significant Subpoena to the City of Mount Vernon Urban Renewal Agency which was rejected because of a sophomoric technical error by his attorney Defendant Mr. Levitt.

30. According to Mr. Charles, even after he was convicted, Defendant Mr. Levitt failed to properly represent him. Defendant Mr. Levitt made a verbal post trial

motion that the judge accepted, requesting that he put the motion in writing, but Defendant Mr. Levitt failed to do so.

31. Defendant Mr. Levitt even attempted to force Mr. Charles to prematurely attend a meeting with a probation officer (before all the necessary reports had been delivered) which might have landed him in jail, and only relented when Mr. Charles, upon the advice of another attorney that he should not attend, lest he risk incarceration, adamantly refused to do so.

32. Subsequently, Mr. Charles hired a new attorney, a Mr. Willstater, to file with the court a post-trial motion, which led to a new trial.

33. In the Reply Affirmation of Richard Levitt in Further Support of Motion for the Appointment of Receiver (which was submitted in support of the Defendant's ultimately successful attempt by Motion to use the Affidavit of Confession of Judgment, obtained through fraud and duress, to force the Premises into Receivership and to have the Defendants awarded the position of receivership of the Premises) Defendant Mr. Levitt explains in Paragraph 2: "In truth, as reflected in the decision of Judge Karas (annexed as Ex. B), the Judgment Debtor is being re-tried on two counts of his federal indictment (but not on a third, for which he is awaiting sentencing) because the U.S. Supreme Court's decisions in *Skilling v. United States*, 130 S. Ct. 2963 (2010), that were handed down after the after the Judgment Debtor's trial, "undermine[d] the basis for his conviction on the so called 'honest services' theory of mail fraud".

34. Thus, although the result was less than satisfactory for Mr. Charles, it undid some of the damage he claims was inflicted upon him by an attorney who was more

interested in collecting extra fees (that may not have been due) than in providing him with the representation he thought he had paid for, by paying $130,000 to Mr. Lefcourt, that was subsequently transferred by Mr. Lefcourt to Defendants.

35. Ultimately, Defendants claimed entitlement to a payment of approximately $280,000 for this representation, via the payment transferred to Defendant Mr. Levitt by Mr. Lefcourt, $130,000, and via the Affidavit of Confession of Judgment of $150,000, and subsequently filed a Motion to place the Premises in receivership and to be appointed as receiver (the "Motion for Receiver"), on March 27th, 2015. In addition, they have claimed interest on 9% over several years on the Affidavit of Confession of Judgment.

36. The date of the filing of that Motion for Receiver, March 27, 2015, was 6 years and three days from the date of the execution by Mr. Charles by fraud and under duress, and fraudulent notarization by Brendan White, of the Affidavit of Confession of Judgment (March 24, 2009), and 6 years and 2 days from the execution and filing of the "Judgment by Confession" (with attached Affidavit of Confession of Judgment) signed by attorney Defendant Nicholas Kaizer, under penalty of perjury, for a judgment of $150,225.00 (March 25, 2009).

37. The choice of a filing date demonstrates Defendants' intent to attempt, in vain, to evade the 6 years statute of limitations on fraud, in order to utilize a fraudulently obtained and notarized document to initiate a fraudulent Motion for Receiver to force the Premises into receivership and have themselves appointed receiver of the Premises, in order to collect unearned legal fees from Mr. Charles.

38. It is the position of the Plaintiffs, however, that the fraudulent acts of Defendants in their efforts to force him to pay fees that were never earned, and thus, overbilled, continued from the date of the execution of the Affidavit of Confession of Judgment to the present date.

39. The Defendants intentionally withheld the Motion to Receiver until they believed the statute of limitations had expired, misrepresenting their intent with regard to the ultimate use of the fraudulently obtained Affidavit of Confession of Judgment, they knew that Mr. Charles would rely upon this intentional misrepresentation by failing to initiate a preemptive lawsuit against them for legal malpractice, fraud and/or civil RICO, Mr. Charles relied on their misrepresentation to his detriment, and suffered damages.

40. Moreover, overbilling clients can constitute an example of fraud, breach of contract and result in violations of the U.S. Racketeer Influenced and Corrupt Organizations Act. Some individuals that have been convicted of overbilling were convicted for mail fraud, or pursuant to the *False Claims Act*.[1]

41. Movie buffs may remember, for example, the movie "The Firm", in which the protagonist, Mitch, devises a plan that allows him to cooperate with the FBI by finding proof that the firm's partners are guilty of overbilling. By mailing these bills to their clients, the firm's partners committed mail fraud--thus exposing them to RICO charges.

42. Plaintiff denies that the legal fees stated due by Defendants is actually due.

---

[1] H. Thomas Milhorn (2004). *Crime: Computer Viruses to Twin Towers*. Universal-Publishers. p. 116-117. Retrieved July 8, 2013.

43. According to Mr. Charles, when he hired Mr. Willstater to secure him a new trial, Defendant Mr. Levitt withheld Mr. Charles' defense trial file as leverage to force him to give Defendant Levitt & Kaizer any proceeds from the sale of another property located at 3 East Third Street, Mount Vernon, New York 10553.

44. Under duress, once again, Mr. Charles signed an agreement to give Defendant Levitt & Kaizer any proceeds from the sale, yet after he did do so Defendant Mr. Levitt informed Mr. Willstater that he did not, in fact, have the defense trial file as he had given the same to Mr. Charles, which was not true.

45. Subsequently, according to Mr. Charles, his ex-wife, Glenda Charles, submitted an affidavit in support of the Defendant's Motion for Receiver which was ostensibly *pro se* but, in fact, appeared to use the very same terminology utilized in the papers submitted by Defendants. Mr. Charles believes that it was Defendants who, in fact, assisted his ex-wife in the preparation of that document. It should be noted that Mr. Charles, when he had to hire Mr. Willstater to handle the post-trial motions regarding his criminal conviction, which cost him $25,000, was forced to fall behind in child support payments, and was thus accused by his ex-wife, Glenda D. Charles (who Mr. Charles believes subsequently conspired with Defendant Mr. Levitt and his partner Defendant Mr. Kaizer in their effort to become named receiver of the Premises) of being willfully delinquent on child support payments, which came very close to resulting in Mr. Charles' incarceration, because it would have thus placed him in violation of the terms of his release while the present trial was pending, and would have thus resulted in his incarceration. Mr. Charles states that the amounts due as stated in the

Affidavit were not due, and in fact were paid, and that the Defendants Levitt & Kaizer, Mr. Levitt, Mr. Kaizer, and Mr. Pollock knew these debts were paid, or were deliberately in denial of the fact that these were paid in order to strengthen their argument that the Receivership was necessary to protect the interests of Mr. Charles creditors.

46. Mr. Charles' belief that Defendants assisted Ms. Glenda Charles in preparing the affidavit, a fact that they have denied in the New York State Supreme Court, is supported by the fact that the Affidavit of Ms. Glenda Charles, a resident of the State of New Jersey, is notarized by a person named Ana Elisa Hoffer, who is a Notary Public of the State of New York, qualified in Westchester County, and the place of business of Lee Pollock is 4 W Red Oak Ln #302, West Harrison, NY 10604, which is in Westchester County, New York. This indicates to Mr. Charles that the Affidavit of Ms. Glenda Charles was prepared by Defendant's attorney Lee Pollock, whose office is also located in Westchester County, New York.

47. Actually, with regard to this affidavit in the Defendants' Motion for Receivership submitted by his ex-wife, Glenda Charles, Mr. Charles found all the references therein to his being under "threat of incarceration" based upon his new trial to be a rather presumptuous attempt by Glenda Charles, *and whoever drafted her affidavit*, to tarnish his reputation before the court of Judge Braun and to insinuate that he would be going to jail sometime soon and that, therefore, would be unable to pay his child support obligations, which he had been paying.

48. Most significantly , however, Mr, Charles states that, in although the affidavit sworn to by Glenda Charles she states in its paragraph 2 that she "is the holder of

two (2) judgments for child support arrears in the amounts of $18,196.49 and $27,499.56", and states in its paragraph 5 of the Glenda Charles Affidavit that "to date the above Judgments have yet to be fully satisfied and Defendant remains on probation under threat of incarceration pending further order of the Court", Ms. Charles has been paid the amount of $18,196.49, and has been paid $25,000, which is the true amount which had been due by Mr. Charles to Ms. Charles.

49. Thus, the statement submitted to the state court via the Glenda Charles Affidavit, upon which the state court states that it rendered its judgment regarding the receivership, is a perjurious misrepresentation to the state court.

50. Moreover, Glenda Charles states in her sworn affidavit dated April 16, 2015, that "Defendant [Wayne Charles] remains on probation under threat of incarceration", although this was not true and, thus, is a perjurious statement. Upon information and belief, Defendant Lee Pollock, Defendant Levitt and Kaizer, Defendant Levitt and Defendant Kaizer, prepared the perjurious Affidavit, had Defendant Glenda Charles sign the same, and had her file the same in the state court action before Judge Braun. The belief that Defendant Lee Pollock, Defendant Levitt and Kaizer, Defendant Levitt and Defendant Kaizer prepared the perjurious Affidavit, had Defendant Glenda Charles sign the same, and had her file the same in the state court action before Judge Braun is buttressed by the fact that 1) the Affidavit was obviously prepared by a lawyer and not by a pro se client, and 2) the Affidavit by Ms. Glenda Charles, who lives in New Jersey, is notarized on April 16, 2015 by a notary, Ana Elisa Hoffer, who is qualified as a notary public in Westchester County, New York, which is the same county of New York where

Defendant Lee Pollock has his office. Defendant Lee Pollock has denied to Mr. Sanchez-Dorta, in the presence of the court attorney of Judge Braun, that his office had anything to do with the preparation, execution and notarization of the Affidavit of Ms. Glenda Charles.

51. Mr. Charles believes that, on numerous occasions, his ex-wife Glenda Charles and Defendants have, in fact, conspired in their efforts to outmaneuver him and to attempt to incarcerate him in order to more easily loot his possessions.

52. Mr. Charles' attorney in his opposition to the Motion for Receiver, Mr. Sanchez-Dorta noted that, during a meeting with the court attorney of Judge Braun, when the minor issue of some tabulations came up, Defendant Lee Pollock stated something to the effect that, since the affidavit from Glenda Charles had arrived at their office in that fashion, that they didn't want to adulterate the same by changing it in any fashion, which struck Mr. Sanchez-Dorta as simply another example, in a long list of examples of the Defendant's protesting just "a bit too much" for no apparent innocent reason, in an obvious attempt to defuse allegations made in Mr. Charles opposition papers that Defendants were conspiring with his ex-wife, Glenda Charles, to incarcerate him and despoil him of the Premises.

53. Mr. Charles believes that part of the purpose and structure of the Motion for Receiver was a last ditch effort to in fact secure his ultimate incarceration, in conspiracy with others, in order to despoil him of all his assets, sophistically drafted in such a way so to avoid direct liability to his prior attorneys, that is, Defendants.

54. For example, as Mr. Charles points out, not content with the fact that Mr. Charles almost went to jail due to what he believes to be Defendants' simple incompetence as his criminal attorneys, not content with the fact that the Motion for Receiver appears curiously timed to exceed by just a few days the expiration of what Defendants might erroneously believe to be the statute of limitations on Mr. Charles case against them for fraud, not content with the fact that the Motion for Receiver appears curiously timed to coincide with the dates of his new trial (so that Mr. Charles would be more likely to simply "give up" the Premises in order to concentrate on preserving his freedom), in their papers in support of their Motion for Receiver Defendants audaciously point to a Deed annexed as Exhibit F to their papers and allege that this same Deed would "appear to be in violation of a Forfeiture Agreement that Charles entered into with the United States of America (Ex. G)" and then actually served those papers on the United States Attorney.

55. Thus, Mr. Charles own attorneys, Defendants, attempted to get his bail revoked, and Mr. Charles incarcerated, in an attempt to concrete their scheme to, in conspiracy with others, overbill Mr. Charles and collect on this inflated bill by forcing the Premises into receivership and having themselves selected as receivers.

56. In fact, such a conspiracy is not so far fetched as it might initially seem as it is very much along the lines of an infamous conspiracy which was foiled so many centuries ago by the learned Roman orator Cicero, who determined to represent a person who was falsely accused of murder, from the threat posed by persons

falsely accusing this individual of murder, and otherwise attempting to engineer his conviction, since they stood to gain a great deal, financially speaking, by his conviction:

"It was in this context that the Pro Roscio Amerino case began. In 81 BCE, Sextus Roscius of Ameria, a wealthy landowner, was murdered while returning from a party in Rome. Immediately following, word of his death was sent by Roscius Magnus, who was in Rome, to Roscius Capito, who was in Ameria. Both men were relations of Sextus Roscius, and according to E.H. Donkin, were rumored to have been on bad terms with the late Sextus Roscius because of a dispute over land. The two men, Magnus and Capito, then sent word of the murder to Cornelius Chrysogonus. Chrysogonus, a favorite of the dictator Sulla, also a freedman— which Cicero mentions as well—then entered into a plot with Magnus and Capito to have the elder Sextus Roscius of Ameria proscribed, and all of his assets taken by the state.[3] Knowing full well that Sulla rewarded those who helped him to eliminate his enemies, the three conspirators expected to receive large amounts compensation in the form of the elder Sextus Roscius' estate. As a result of their "loyalty" the men were able to purchase the estate for 2000 sesterces, which was well under the estimated value of the property.

However, the eldest (and only living, as is mentioned in the text) son of Sextus Roscius, Roscius of Ameria, still had a rightful claim to his late father's property if he and the people of Ameria could somehow have the elder Sextus Roscius' name removed from the proscription list. Sensing this threat, the three conspirators accused Roscius of Ameria of parricide and the murder of his own father in order to gain more property for himself in 80 BCE. A virtual unknown within the city of Rome, Roscius of Ameria had little clout. Furthermore, despite the noble contacts that his father had made, many feared to help him to clear his family's name because their help may have been construed by Sulla (he was at this time consul of Rome and the court was under his jurisdiction) as a threat or insult. In short, most feared that by helping Roscius of Ameria, that they would themselves be proscribed, executed, and have their assets taken away from their families. This seems to be one of the reasons that his case was given over to the young Cicero."[2]

57. Thus, it is Mr. Charles belief that not very much has changed since the time of

[2] Wikipedia, February 17, 2015, re: Cicero.

Cicero, and all of the individuals named in this action are involved in a conspiracy, a conspiracy which falls within the confines of civil RICO, to unlawfully derive profit from the sale of the Premises through overbilling, fraud, bribery of officers of the court, obstruction of justice, extortion, threat of financial harm, and other acts as set forth herein.

58. Coincidently, on the very day that Judge Braun of the Manhattan Supreme Court issued his order granting Defendant Levitt & Kaizer receivership over the Premises, 9/28/15, the New York Law Journal published an article entitled "Disbarred Lawyer Faces New Larceny Charges", which initially explained that "Michael Lippman, who pleaded guilty a year ago to overcharging the estates of Bronx residents, was charged Friday with the theft of nearly $1.5 [Million]"[3].

59. An article in the Daily News on 7/08/10 entitled "Lawyer charged with usurping $300G from estates of people who died without a will"[4], which dealt with Mr. Lippman's abuse of his position as counsel to the Bronx Public Administrator, demonstrates some interesting parallels to the instant case before this Court.

60. "Lawyer Michael Lippman, counsel to the Bronx Public Administrator from 1983 through last year, surrendered yesterday to face charges of billing for work he never performed on five estates" (Defendants also demonstrate a willingness to abuse a court appointed fiduciary position [For example, their threat to sell the Premises at a "Fire Sale Price", discussed below], and demonstrate a willingness to bill clients for work never performed).

---

[3] http://www.newyorklawjournal.com/id=1202738271330/Disbarred-Lawyer-Faces-New-Larceny-Charges
[4] http://www.nydailynews.com/news/crime/michael-lippman-lawyer-bronx-public-administrator-stole-300-000-prosecutors-charge-article-1.464243

61. "DOI Commissioner Rose Gill Hearn said Lippman used his position "to extract excessive and unearned fees from the estates of deceased Bronx residents" (Defendants attempted to secure a position as receiver, gained through the manipulation of the legal system via the unlawful utilization of a Affidavit of Confession and Judgment executed under duress and through fraud, to extract excessive and unearned fees).

62. Lippman took advantage of "vulnerable families unfamiliar with the intricacies of probate law" (Defendants took advantage of Wayne Charles' extremely vulnerable position, and his lack of familiarity with i) the process involved in an attorney's withdrawal of representation in a criminal matter, and ii) the process involved in the execution of an affidavit of confession of judgment by an attorney's client [for example, the right to have an independent attorney advise the client regarding his execution of the same]).

63. "His lawyer, Murry Richman said the statute of limitations had expired on the charges of grand larceny, scheming to defraud and falsifying business records" (Defendants filed their Order to Show Cause seeking to be appointed receiver on the Premises on March 27, 2015, literally 3 days and six years from the date that Mr. Charles executed the Affidavit of Confession of Judgment, in a transparent attempt to shelter themselves from any allegations relating to fraud and Civil Rico, because of the six year statute of limitations on the same).

64. "Records show that during that time, Lippman was drowning in debt – facing foreclosure on a $400,000 mortgage, $1 Million in gambling losses and $600,000 in unpaid taxes." (Mr. Charles alleges that, upon information and belief,

Defendant Mr. Levitt is facing financial difficulties, and it is for this reason that he has been so urgently pursuing the execution of this Affidavit of Confession of Judgment, obtained under fraud and duress).

65. "Richman said the Bronx district attorney's office was meddling in a lawyer's ability to run his business. 'It puts a chilling effect on all attorneys charging fees because the district attorney has the opportunity to look over what fees can be charged". (In his affidavit as part of the Reply Affirmation of Lee A. Pollock in Further Support of Motion for Appointment of Receiver, Defendant Mr. Levitt also cynically attempts to shield himself from any third party's review of his fees by stating that: "The Judgment debtor's assertion that he signed the confession of judgment under duress because he was in the middle of a criminal trial must, of necessity fail, because if an attorney asking for payment during a criminal trial amounted to duress, then the attorney could never insist on payment for his services". It should be noted, moreover, that Mr. Charles has no objection to the Defendants charging their earned fees, he merely objects to the Defendants i) charging him for fees that were not due, ii) forcing him through fraud and duress to sign an Affidavit of Confession of Judgment to these fees, iii) continuing in their attempt to force him to pay for these fees by withholding his file as his post trial motion was more expertly handled by another attorney, and iv) waiting 6 years and a few days [in a transparent attempt to shield themselves for any wrongdoing due to the statutes of limitations on fraud and civil RICO] to move to be appointed as receiver of the Premises in order to overbill him.)

66. According to an article in the Daily News dated 3/03/15, entitled "Bronx Lawyer

who Stole From Client's Wills to Pay 150k"[5], "Lippman took a plea deal in September in which he agreed to pay back $145,829.40 to the estates of two families. Lippman would have faced two to six years behind bars had he not coughed up the fine."

67. Apparently, Lippman was not able to shield himself for liability for his wrongdoing based upon the statute of limitations, as Defendants, given their most recent submission of papers in Court in furtherance of their fraud, cannot expect to avail themselves of the statute of limitations.

68. An article in Wise Law New York dated 4/13/2012 entitled "Lawyer, Hired by Bronx Surrogate, Wore Wire in Cleanup Effort"[6] reports that "In January 2011, the New York State Commission on Judicial Conduct filed disciplinary charges against Surrogate Holzman accusing him of breaching the ethical code for judges by not properly supervising Mr. Lippman and by failing to report his alleged improper billings to law enforcement authorities." (In the instant case, Judge Braun was presented with allegations regarding Defendant's fraudulent acts, yet inexplicably failed to even question the Defendants with regard to these allegations, failed to report the same to enforcement authorities and actually granted the Defendants a position as receiver of the Premises. The judge attempted to shield himself and his court from any accusations of wrongdoing by obligating the Defendants to secure a bond of $3 Million, acknowledging that the same was necessary since it is an apparently common occurrence that lawyers are

---

[5] http://www.nydailynews.com/new-york/bronx/bronx-lawyer-stole-clients-wills-pay-150k-fine-article-1.2135272
[6] https://wiselawny.wordpress.com/2012/04/13/lawyer-hired-by-bronx-surrogate-wore-wire-in-cleanup-effort/

accused of stealing funds [a fact that had been brought to the attention of the court that very day by J.A. Sanchez-Dorta's reference to the case of Mr. Lippman during his meeting with the court's attorney], but reassuring Defendants (upon the objection by Defendant's attorney, Lee Pollock) that the cost of the bond would ultimately be borne by Plaintiff since the costs of the receivership were to be borne by the Plaintiff.).

69. Literally 10 minutes after the judge delivered his verdict awarding Defendants a position as receiver of the Premises, and specifying their fiduciary obligation to seek the best value in the sale of the Premises, the Defendants revealed to the Plaintiff's attorney, J.A. Sanchez-Dorta, their willingness to abuse their position by utilizing unethical high pressure tactics to, in violation of their fiduciary obligations, force the Plaintiff to pay them their overbilled and unearned fees.

70. Defendant's attorney approached Plaintiff's attorney J.A. Sanchez-Dorta, and recommended that going forward the parties attempt to resolve matters relating to the receivership in an amicable rather than an acrimonious fashion, stating that "We can do this in the easy way, or we can do this the hard way".

71. Defendant Nicholas Kaizer stepped into the conversation and threatened (in complete disregard of the court appointed fiduciary obligation that he had received literally ten minutes before) that he and the other Defendants could carry out the sale of the Premises at a "Fire Sale Price" of "$1.5 Million" (while the Premises are valued in excess of $3.2 Million) if the Plaintiff didn't cooperate.

72. Attorney J.A. Sanchez-Dorta turned to Defendant's attorney Lee Pollock and directly asked him whether he had heard the term "Fire Sale Price" and he

confirmed that he had, but clarified that Defendant Nicholas Kaizer merely meant to say that he could sell the Premises to the first person that came along.

73. Defendant Kaizer, visibly angered, inquired whether he was "in a deposition" and stormed out of the courtroom, soon followed by his attorney.

74. Attorney J.A. Sanchez-Dorta asked Andre Haynes, the sole other attorney sitting in the courtroom, present at the court in an entirely unrelated matter, who had witnessed the entire conversation, whether he had hear the term "Fire Sale Price" and he smiled and confirmed that he had. Attorney J.A. Sanchez-Dorta asked him for his card, and he gave him a copy of his card.

75. Thus, Defendants confirmed, to the satisfaction of attorney J.A. Sanchez-Dorta that, in accordance with that alleged by his client, Plaintiff Wayne Charles, from the very first consultation, Defendants would stop at nothing in order to receive payment for their apparently overbilled and unearned fees.

76. The law is pretty well settled, for a long time now, as to the fiduciary obligations of a receiver, which Defendants (by filing the Motion for Receiver whereby the requested to be named receiver of the Premises, and by initially accepting the position of receiver when they did not object to Judge Braun's appointing them in court as receiver of the Premises) as attorneys represented to a New York State court that they were willing and able to fulfill.

77. A receiver is an officer of the court and a fiduciary. *Insurance Company of New York v. City of New York*, 71 N.Y.2d 983, 529 N.Y.S.2d 70, 524 N.E.2d 424 (1988). The office of receiver is one which involves trust; he is not only an officer of the court but a fiduciary as well". *Cohen v. Hechtman*, 187 Misc. 994,

66 N.Y.S. 2nd 305 (Sup. Ct., NY Co. 1946). The New York Court of Appeals , in

*Birnbaum v Birnbaum*, 73 N.Y.2d 461, 541 N.Y.S.2d 746 (1989) (Wachter, C.J.)

reaffirmed the basic obligations of a fiduciary:

> [I]t is elemental that a fiduciary owes a duty of undivided loyalty to those whose
> interest a fiduciary is to protect...This is a sensitive and "inflexible" rule of
> fidelity, *barring not only blatant self-dealing, but also requiring avoidance of
> situations in which a fiduciary's personal interest possibly conflicts with the
> interest of those owed a fiduciary duty.*

Birnbaum, 73 N.Y. 2d at 466. (emphasis added)

78. Since Mr. Charles, after payment of all his creditors upon the sale of the Premises,

    is entitled to the surplus, he is one of those owed a fiduciary duty, and Defendants

    have threatened to sell the Premises at a "Fire-Sale Price", thus threatening that

    surplus in order to force him to do what they want him to do, and force him to

    surrender any legal rights that he may still have vis-à-vis any Receiver.

79. Defendants, with this one statement made to Mr. Sanchez-Dorta, demonstrated

    that they would be willing to violate a court ordered mandate, issued not ten

    minutes before, partly based upon their representations, in court both orally

    (during meetings with Judge Braun's assistant, Ms. Kern-Rappy) and via their

    moving papers and their reply to the Plaintiff's opposition, that they could carry

    out their obligations as receiver to the Premises and that the alternative, a sheriff's

    sale, or the sale by another receiver, would result in a lower price for the Premises

    or in more expense for the Plaintiff.

80. Defendants actually write in their Motion for Receiver, "12. Since law firms are

    bound by *ethical duty* to appropriately manage trust funds, the Judgment Creditor

    is an appropriate choice to act as a receiver in this case. It is unnecessary to

require that the Levitt and Kaizer firm post a bond or undertaking since *they are bound to act ethically and with the utmost integrity, and their law licenses are at risk if they do not do so*".

81. Moreover, according to the Affirmation of Lee A. Pollock in Support of CPLR 5228 Motion for Appointment of a Receiver, "2. Briefly stated, the appointment of a receiver to sell the Property is necessary and appropriate because the Property is the only known asset of the Judgment Debtor, a sheriff's sale is not likely to recover the fair market value of the property…and a sale arranged by the Receiver utilizing an experienced real estate broker with knowledge of the Property's neighborhood and market conditions will maximize the chances of satisfying all judgments and encumbrances and recovering surplus monies for the Judgment Debtor".

82. Throughout negotiations over the matter with a Court appointed mediator, and before the Court itself, Defendant's attorney maintained that it was actually in the interest of Mr. Charles to appoint them as receiver since the appointment of another receiver would entail that receiver's collection of a 5% fee for the sale of the Premises.

83. Nevertheless, Defendants, once actually awarded the position as Receiver, subsequently threatened to sell the Premises at a 50% discount.

84. Moreover, Defendants, with this one statement, demonstrated their willingness to utilize *strong-arm tactics*, in complete disregard of their ethical and/or fiduciary obligations, of the type described by Mr. Charles since his first consultation with Mr. Sanchez-Dorta, in an effort to achieve their aims.

85. It became evident, thus, that the only reason that the Defendants desired to be appointed as receivers of the Premises was not to save Mr. Charles the 5% fee as they stated in their papers and during meetings with Judge Braun's assistant Ms. Kern Rappy was the advantage of having themselves appointed as receiver, but to be placed in a excellent position to "strong arm" Mr. Charles, as has always been their strategy in order to secure the payment of their unearned and overbilled fees.

86. Unfortunately for Defendants, in the heat of the moment, temporarily stupefied by the hubris that comes with having just 10 minutes before consummated a fraud he had been planning and orchestrating for over 6 years, Defendant Mr. Kaizer unwittingly revealed the Defendants plan.

87. Thus, two days later, September 30, 2015, Defendant's attorney Lee Pollock, no doubt in reaction to the Defendant Mr. Kaizer's ill advised outburst of his true intent, very wisely wrote a letter to Judge Braun "to advise the Court that my clients, Messrs. Levitt and Kaizer, have declined to act individually as receiver in the above matter and request that the Court appoint a receiver from its list". Judge Braun subsequently appointed a receiver for the Premises, Paul A. Shneyer, who is a Defendant in his action individually, and in his capacity as the court appointed receiver of the Premises.

88. These developments further served to convince Mr. Charles attorney J.A. Sanchez-Dorta, that Mr. Charles allegations were not as outlandish as an ordinary person, upon hearing the same and considering the consequences for attorneys engaging in such conduct, might initially believe.

89. Most significantly, the above, when added to the below, have demonstrated to Mr.

Sanchez-Dorta the potential validity of Mr. Wayne Charles allegations stated in his first interview with Mr. Sanchez-Dorta that *Defendants intentionally chose the venue that they believed would award them a position as receiver of the Premises*.

90. These allegations made by Mr. Charles seemed incredible to Mr. Sanchez at the time, but given: a) truly odd occurrences in the handling of this case by Judge Braun's court, in particular, by his court personnel; b) given truly odd comments by Defendants, their lawyers, and court personnel during the handling of this matter, c) given allegations regarding corruption in New York State Courts; and d) given the threat by Defendants to sell the Premises at a "Fire Sale Price", in direct contravention of the fiduciary duty to seek the best price for the Premises, to fail to at least present the argument, and the evidence therefore, to this Court might constitute a violation of an attorney's ethical obligation to his client.

91. First of all, it is obvious that the New York State Courts are not as corruption free as one might assume they should be. In fact, among many lawyers who practice in New York, there is an unspoken assumption that the New York State Courts are corrupt. One lawyer recently stated to Mr. Sanchez-Dorta, "We all know the Courts are corrupt. Only you don't say so".

92. Many lawyers, on the receiving end of the corruption, are simply unwilling to say so due to potential threats to their license to practice law in New York State which license, if they lost it, might very well leave them destitute. Nevertheless, the corruption apparently exists, and, in fact, it is difficult to demonstrate that the current system works any different than it did under Tammany Hall, when William M. Tweed, known as "Boss" Tweed, ran an efficient and corrupt political

machine based on patronage and graft. Still, very few attorneys are willing to assume the role of Serpico and reveal their "brothers'" corrupt acts.

93. Nevertheless, just recently, on January 25th, 2015, an eye opening article appeared in the New York Post, entitled, "Silver's Law Firm Rakes in Millions from *Judges He Controls*"[7] [Emphasis added]. The allegations are *absolutely astounding*:

> "Sheldon Silver has perverted the courts as well as the Capitol.
>
> His law firm, Weitz & Luxenberg, gets its asbestos cases — and paydays — moved more quickly than those of other attorneys, and *reaps a fortune from favorable rulings by friendly judges*, charge lawyers and tort-reform advocates.
>
> Silver's East Village firm handles more than half the cases in a special section of Manhattan Supreme Court called NYCAL (New York City Asbestos Litigation). So dominant is the firm, the court's Web site refers to cases as "Weitz" or "non-Weitz."
>
> The chief asbestos judge, Sherry Klein Heitler — also Manhattan's chief civil judge - - has handled dozens of Weitz & Luxenberg cases.
>
> *"They've taken over a section of the courthouse, and the people in charge of the courthouse run it for them," said a disgusted lawyer* who files personal-injury cases in Manhattan. *"It pours money into the firm."*
>
> ...
>
> Last month, the American Tort Reform Association *branded NYCAL the nation's top "judicial hellhole," saying it's rife with plaintiff attorneys "brazenly favored by the judges."*
>
> The group largely blames Silver, who not only has killed any tort reform, such as efforts to limit claims and cap damages, in Albany, but wields enormous power over the judiciary. *"Imagine you're a judge and you know the person in front of you litigating in asbestos court is also responsible in some way for*

---

[7] http://nypost.com/2015/01/25/silvers-law-firm-rakes-in-cash-as-asbestos-court-fast-tracks-claims/ (See Additional Exhibits).

*your career,"* said Tom Stebbins, a spokesman for the New York Lawsuit Reform Alliance, which also faults Silver.

As Assembly speaker since 1994, Silver names one of 13 members to a state judicial screening committee. The panel recommends candidates for the governor's appointment to the Court of Claims and Appellate Division and other judge vacancies.

*In 2008, Silver named his law partner and another Weitz & Luxenberg founder, Arthur Luxenberg, to the committee, ignoring the blatant conflict of interest.*

*Silver also plays a key role, along with Gov. Cuomo and the state Senate majority leader, in negotiating the judiciary's budget.* In 2011, Silver's appointee to a seven-member state commission cast the deciding vote to give all state judges a 27 percent pay hike.

As one of the state's most powerful Democrats, Silver also strongly influences his party's nomination of candidates for judgeships in Manhattan and elsewhere. Heitler and Madden are both Democrats, and both first ran for the bench during Silver's tenure as speaker.

"He has a hand in judicial appointments, and judges know not to bite the hand that feeds them," said Mark Behrens, a DC attorney who advocates for asbestos-litigation reform for defendants.

To top all that, Silver persuaded former Gov. David Paterson in 2009 to appoint Jonathan Lippman, his boyhood chum from the Lower East Side, as the state's highest jurist, Chief Judge of the Court of Appeals, Village Voice reporter Wayne Barrett wrote at the time. Silver had boosted Lippman's career for years. He was the court's chief administrative judge from 1996 to 2007.

Lippman, who runs the entire court system, has long held the authority to assign judges to top administrative posts and influence how lawsuits are handled, among other powers.

Heitler was promoted to Manhattan's chief administrative judge in 2009, a post she holds in addition to running asbestos court.

Sources say Weitz & Luxenberg gets the "red-carpet treatment" in Manhattan, including "more experienced and better judges" in the asbestos court.

One lawyer said he recently showed up to start a trial.
"In walked the Weitz & Luxenberg lawyers," he said. The entire pool of 150 potential jurors was herded into their courtrooms.
"A jury clerk told us, 'The asbestos cases are taking priority. You have to wait,' " the lawyer recalled, griping that his trial was delayed four days until another batch of jurors became available.

"All the other lawyers — and their clients — are getting screwed," he said.

State courts spokesman David Bookstaver said Friday that he could not reach anyone to explain the alleged jury hogging. Weitz & Luxenberg filed 53 percent of the NYCAL mesothelioma cases and 74 percent of the lung-cancer cases from 2011 to 2013, Bates White found. Besides the landmark $190 million award, the firm last June won $25 million for two workers exposed to asbestos insulation, and $20 million for the family of a former ship fitter who died. The indictment says Silver pocketed $5.3 million from Weitz & Luxenberg without ever doing legal work — as he was paid a yearly salary of $120,000 (for a total $1.4 million since 2002) and $3.9 million in "referral fees."

Silver allegedly drummed up plaintiffs — and referral fees — by having Columbia University Medical Center cancer researcher Dr. Robert Taub funnel mesothelioma patients to the firm. In return, Silver allegedly steered $500,000 in taxpayer-funded grants to Taub and $25,000 in state funds to a nonprofit where Taub's wife sat on the board of directors, and helped find a job for Taub's son at a different nonprofit. Dr. Taub has been fired." [Emphasis Added]

94. That article was followed, on February 1, 2015, by an even more astounding article in the New York Post, entitled, *"Feds investigating Silver's influence over civil court"*[8], which states that:

"The country's most important civil court is *under federal investigation*, an insider says.
"The probe is focusing on the state Supreme Court's civil division at 60 Centre St. in lower Manhattan, where many tentacles reach to disgraced Assembly Speaker Sheldon Silver, the court source said.

---

[8] http://nypost.com/2015/02/01/feds-probe-civil-court-following-silvers-arrest/ (See Additional Exhibits).

Silver was arrested last month on corruption charges, and Manhattan US Attorney Preet Bharara warned the public to *"stay tuned" for more developments.*

The case against Silver centers on his freelance legal "work" and the millions of dollars in bribes and kickbacks he hauled in from real-estate and asbestos claims, the feds say.

Many of these cases landed in the courtrooms at 60 Centre St., presided over by judges with ties to Silver and his lifelong pal, Jonathan Lippman, the chief judge of the state Court of Appeals." [emphasis added]

95. Thus, if the above is actually true, what does this mean for state of our present New York State judicial system? Could it be true, as Mr. Charles insists, that he cannot get a fair disposition from a New York State court, and that a particular matter could be steered to a particular judge for a particular reason?

96. As mentioned above, it is curious that Judge Braun did not report this matter, given the seriousness of the allegations stated in Mr. Charles opposition to the Motion for Receiver, to any other authority, not even to the grievance committee, and did not even inquire the Defendants as to the veracity of the allegations.

97. By far, however, the oddest occurrences in this entire matter were experienced by Mr. Sanchez-Dorta during meetings between Mr. Sanchez-Dorta and Defendant's attorney Lee Pollock with Michelle Kern-Rappy, an attorney charged by Judge Braun with helping the parties achieve a settlement in the matter of the Motion for Receiver.

98. According to Mr. Sanchez-Dorta, the first meeting went off without any odd occurrences. The parties discussed their matter, parameters for settlement were discussed in detail, but ultimately the parties could not reach an agreement.

99. According to Mr. Sanchez-Dorta, the second meeting, however, was extremely odd. Firstly, when Ms. Kern-Rappy entered the room, and then exited to retrieve her papers, Defendant's attorney Lee Pollock asked Mr. Sanchez-Dorta if she was

the same attorney who they had met with the last time. It seemed pretty obvious to Mr. Sanchez-Dorta that she was the same attorney who they had met with the last time (they had appeared before her perhaps two months before, at a meeting lasting well over half an hour). That comment, alone, did not seem odd to Mr. Sanchez-Dorta.

100.    Nevertheless, upon returning to the room, Ms. Kern-Rappy also seemed to feign ignorance as to whether we had appeared before her with regard to the matter, and at that point it began to seem to Mr. Sanchez-Dorta that Mr. Lee Pollock and Ms. Kern-Rappy were protesting a bit too much about the fact that they did not recognize one another.

101.    Once the issue as to whether Mr. Sanchez-Dorta and Mr. Pollock had appeared before Ms. Kern-Rappy before had been settled, they turned to the issue of a letter Mr. Sanchez-Dorta had mailed to the court to clarify that Mr. Wayne Charles' conviction had not been overturned on the basis of the Defendant's incompetent counsel, but based on the subject of "honest services".

102.    This letter had been at the request of Mr. Pollock, accompanied by a threat to take some sort of action against Mr. Sanchez-Dorta for making the erroneous statement in his papers that the conviction had been overturned based upon ineffective assistance of counsel, at which point Mr. Pollock had urged Mr. Sanchez-Dorta to inform Judge Braun's court that it was his client who had intentionally misinformed him. Mr. Sanchez-Dorta had realized that the mistake had been his own, given the fact that he had to prepare his papers in an exceedingly short time, and, resisting the pressure of opposing counsel to betray

his client, Mr. Charles, in order to avoid sanctions of some sort, informed the court of this error by this letter.

103.     Ms. Kern-Rappy initially seemed to feign ignorance as to whether she had received or reviewed the letter, and then, once she found the letter in her file, was able, with a single five second glance at the letter, miraculously expound on the issues raised in the letter.     Any layman would have determined, given the patently transparent theatrics of Ms. Kern-Rappy, that she had read that letter in detail, and discussed the issues addressed in that letter with someone else.

104.     Most significantly, however, is that at that same sitting Ms. Kern-Rappy, in an effort to help the parties reach a settlement, pointed out at one point that "You could make money on this." When Mr. Sanchez-Dorta asked Ms. Kern-Rappy to clarify how his client could make money on this, Ms. Kern-Rappy smiled at him and said, *"No, you could make money on this"*.

105.     Thus, Ms. Kern-Rappy insinuated that, by Mr. Sanchez-Dorta betraying his client, and forcing his client to accept an arrangement that was not in his interest, Mr. Sanchez-Dorta could effectively enrich himself, thus joining Defendants in their efforts to fleece Mr. Charles.

106.     When Mr. Sanchez-Dorta protested that he would not do this to his client, and that doing the same was unethical, Ms. Kern-Rappy became very nervous and seemed angry.

107.     Ms. Kern-Rappy then asked another lawyer appearing on the case during those settlement negotiations for the bank holding a mortgage on the Premises whether the computer he had opened on the desk was taping anything, and he told

her it wasn't.

108.     Evidently, taping is not permitted in New York State Courts.  There may
be some valid reasons why, but the ultimate effect is that the rule prohibiting
taping protects those who would engage in back-room deals which they would not
like to come to light, and Mr. Sanchez-Dorta witnessed this first hand by Ms.
Kern-Rappy's attempt, in effect, to bribe Mr. Sanchez-Dorta into betraying his
client.

109.     Subsequently, after Ms. Kern-Rappy determined that Mr. Wayne Charles'
attorney would not consent to an arrangement essentially condoning the
Defendants' fraud and duress, despite her efforts to convince Mr. Sanchez-Dorta
to betray his client, she referred the matter back to Judge Braun.   In the
courtroom, Mr. Judge Braun immediately answered a telephone call, which
seemed to Mr. Sanchez-Dorta to be from Ms. Kern-Rappy updating him on the
matter.

110.     Immediately after that, Ms. Kern-Rappy once again appeared in the
courtroom, visibly angry and upset (it appeared to Mr. Sanchez-Dorta that the
gravity of her statement to him had occurred to her), to hand some papers to Judge
Braun (likely the file in the case), and Mr. Sanchez-Dorta never saw her again.

111.     In the next and last court appearance before Judge Braun, another person,
holding herself out as the court attorney, met with Mr. Sanchez-Dorta and Mr.
Lee Pollock (Defendant Nicholas Kaizer was there as well).

112.     At that meeting, Mr. Lee Pollock did not question Mr. Sanchez-Dorta as to
whether they had appeared before that court attorney before, because it was

obvious that they hadn't, as it was obvious in the second meeting with Ms. Kern-Rappy that they had, in fact, previously appeared before Ms. Kern-Rappy.

113.    During that last appearance, other statements were made which to Mr. Sanchez-Dorta seemed quite curious.

114.    First, when the court attorney mentioned that the affidavit of Glenda Charles, Mr. Charles' ex-wife, submitted by Defendants in support of their motion for receiver, did not have an exhibit tab, Mr. Pollock insisted that the same was because, when his office initially received the same from Glenda Charles, they did not want to change anything at all regarding the affidavit so as not to adulterate the same. This seemed to Mr. Sanchez-Dorta a transparent attempt to shield Defendants from the following allegations made in Mr. Charles' affidavit in opposition to Defendant's motion for receivership, and to distance the Defendants from Glenda Charles:

"36. Due to the fact that I had to hire Mr. Willstater to right the wrong that had been done to my by Defendant Mr. Levitt, his partner, and Plaintiff, to the tune of $25,000, I was forced to fall behind in child support payments, and was thus accused by my ex-wife, Glenda D. Charles, who now joins Plaintiff and my attorney Defendant Mr. Levitt and his partner Defendant Mr. Kaizer in their effort to become name receiver of the Property, of being willfully delinquent on child support payments, which came very close to landing me in jail, which would have thus placed me in violation of the terms of my release while the present trial was pending, and which would have thus resulted in my incarceration.
37.I find it more than curious, moreover, that my ex-wife, Glenda Charles, has submitted an affidavit in this case which is ostensibly *pro se* but, in fact, appears to use the very same terminology utilized in the papers submitted by Plaintiff (and my former "attorney" Defendant Mr. Levitt and his partner Defendant Mr. Kaizer). I understand my wife to be an intelligent woman, but I never believed that she could draft, *pro se*, without the assistance of any attorney, a document that is so legally elegant. I am eager to discover who, in fact, assisted her in the preparation of that document and to consider the implications of that when the facts come to light." (Wayne Charles Affidavit in Opposition to Defendant's Motion for Receivership).

115.     Either of these statements, taken alone, would be meaningless, yet Mr. Sanchez-Dorta has never, in his 20 years of practice, 10 years before the New York Courts, heard so many seemingly contrived statements by his opposition and court personnel apparently directed to demonstrate how completely unfamiliar they were with one another and others.

116.     Now, whether or not someone in this particular court is corrupt is a question that must only be determined by a complete process of disclosure, and only with extreme difficulty.  Save some sort of tape of court personnel actively conspiring with Defendants, it would be almost impossible to prove that a New York State court was actively conspiring with a litigant to favor that litigant.

117.     In fact, tape recordings are not permitted in the courtroom, and on the few cases where a New York State court personnel have been discovered on tape actually conspiring with a litigant to favor that litigant, it was normally, with the exception of the Lippman case, only because the attorney also engaging in the impropriety taped that court personnel.

118.     Consider, in connection with the allegations made in this Verified Complaint, the possible relevance of the following statements of Michael Vecchione, the former chief of the Racket's Division of the Kings County District Attorney's Office in his book regarding his investigations of corruption in the Kings County Supreme Court (which ultimately led to the prosecution of Judge Victor Barron and Judge Gerald Garson), Crooked Brooklyn:

a) *"Imagine,* I thought, *what went on behind closed doors before we got our camera in that ceiling.  That we will never discover."* (page 188) [emphasis in the original].

b) [Brooklyn District Attorney Hynes] "…stood and pointed to the building far below and across Adams Street, a wide boulevard, the Kings County Supreme Court Building. There, thousands of criminal and civil trials were conducted each year by hundreds of supreme court judges supported by thousands of civil service staff.

'Mike, do you believe there is corruption in that building?'

I did and I told him so. I told him everyone thinks there are corrupt judges and lawyers and even court clerks and uniformed officers.

'Well, Mike, that's what I wanted to hear. I am naming you chief of the Racket's Division, and I want you to pursue any lead you get that would expose corruption in that building. Are you up for that?'

…I have often wondered whether he knew something about judicial corruption that he could not tell me at that meeting." (page 29).

c)      "Attorneys, judges and high-ranking court officials have close relationships. Many grew up in the same neighborhoods, went to the same schools, and worked together as young lawyers. In Brooklyn they were also members of the same political party." (page 67)

119.      Perhaps significantly, at a court appearance before Judge Braun on January 28, 2016, at which time Judge Braun recused himself in the New York State Supreme Court action upon motion by Mr. Wayne Charles, Judge Braun admits that he knows the Receiver, Defendant Paul Shneyer, from his former days when he was involved in politics, yet states that he is no longer involved in politics.

120.      The fact that it is so difficult to prove such conspiracies, but that on occasion, under the most unlikely circumstances, such conspiracies do come to light and are in fact proven, suggests that such conspiracies occur, a lot.

121.      Then again, even the appearance of impropriety is a dangerous thing, and should be avoided in any court. And without a doubt, Ms. Kern-Rappy's suggestion that Mr. Sanchez-Dorta should betray his client was improper, as it incorporated, among other things, issues of "back room" dealing, betrayal of a

client for an attorney's own financial benefit, and perhaps, even, bribery, since Mr. Sanchez-Dorta is an officer of the court.

122.     If this is the sort of thing that a court attorney is prepared to engage in, with an opposing counsel who is ethically obligated to reject the offer, what else is this court attorney prepared to do in order to ensure that all the attorneys involved "make money"?

123.     This is not an insignificant concern.   The power of receivership is an extremely effective weapon for a great many persons to "make money" in conspiracy with one another, which conspiracy would require no more than a few telephone calls and the filing of a few documents in state court in order to divide hundreds of thousands and even millions of dollars, and thus, it would be difficult to resist such a temptation.   Private schools, and membership at the better clubs, don't come cheaply, after all, and desperate times call for desperate measures.

124.     For example, as Defendant Pollock readily admits, in his affirmation in support of the Order to Show Cause for Receivership, "a foreclosure action was dismissed without prejudice for failure to proceed with timely prosecution on July 17, 2013".   What he fails to discuss, however, is why bank's attorneys commonly fail to proceed with timely prosecution of certain matters.   After all, the bank's attorney in this matter, the Druckman Law Group, is not in the business of making itself liable for legal malpractice, and neither are many of the law firms who prosecute foreclosures yet, more often than not, these firms miraculously fail to submit vital motions.   This is even when specifically requested by the court, and specifically notified that the case will be dismissed if they don't file by a date

certain, as was the case with the instant Premises, since on 1/29/13 the Bank of New York was ordered to proceed within 90 days for motion for receiver and failed to do so. These law firms have sophisticated software which inform them of deadlines and have many employees who stand to be fired if they miss a deadline yet, again and again, these foreclosure cases are dismissed for failure to prosecute. It seems likely that the reason that these law firms fail to proceed, and the Druckman Law Firm failed to proceed in the case against the Premises, is that if they had submitted papers, they would have left themselves obviously vulnerable to charges of perjury. Some of this is related to the "robo signing scandal" of a few years ago, and some of this may exceed even that revealed during the "robo signing scandal". Thus, many banks, such as Bank of New York Mellon, are presented with the unenviable position of possessing mortgages that they cannot foreclose upon without being held liable for perjury. There is, however, an option available for them. They may simply communicate with a judgment creditor on a particular property who is willing to cooperate with them by filing a Motion for Receivership. The Receivership, once approved, will result in the sale of the property, which will result in the satisfaction of the mortgage. In the instant case, if this Court fails to stop the Receivership awarded by Judge Braun's court, first to lawyers who demonstrated their willingness to sell the Premises at a fire sale price, and then to a lawyer, Paul Shneyer, who Judge Braun admits that he knows from his days in politics, a mortgage which could not be foreclosed upon on the Premises, because of the danger of subjecting the Defendant Bank of New York and its attorneys to charges of perjury, will

ultimately be satisfied and these fellows will receive a satisfaction of approximately $900,000 (which is an amount significantly in excess of the value of an effectively uncollectible mortgage).

125.    Moreover, the Court will permit this model for collecting on essentially uncollectible mortgages, which *likely number in the thousands* in New York State alone, to succeed, permitting these financial institutions, and their lawyers, to make an "end run" around the laws prohibiting perjury, and laws established by the New York State legislature to protect homeowners, including laws regarding settlement foreclosure conferences, and requisite notices.

126.    This is a model that has very likely been used or will continue to be used by other financial institutions until it is revealed and prohibited. In fact, a financial entity (or even an individual) may presently purchase a mortgage for pennies on the dollar from another financial entity which has been frustrated in its ability to foreclose on the mortgage and then, using this strategy, collect the entire amount of the mortgage. Such schemes, in many different forms, are proliferating on such a rapid basis that enforcement authorities are not aware of the scheme, until it is too late, and the only persons that can help the authorities to spot the schemes are attorneys who are presented with such schemes on a regular basis and are, thus, able to determine the patterns of these schemes and are foolhardy enough to weather the threats against them when they discover these schemes, which schemes if consummated will result in windfalls of millions of dollars to the perpetrators.

127.    For example, on Tuesday, February 2, 2016, an article appeared in the

Daily News entitled, "House-theft Scams Soaring" which states that: "The City is dealing with a spate of cases where crooks swipe homes from under the owner's nose through deed fraud schemes, officials said Monday. The Department of Finance is pursuing 525 investigations involving 671 properties across the five boroughs, mostly in Brooklyn and Queens, according to the agency's testimony to a City Council hearing. The thefts involve either outright forgery – where a deed to change ownership is filed with a fake signature – or scams where homeowners are talked into signing over their property, often on the promise of help with a delinquent mortgage."

128.    On November 29, 2012, more than four years previous to the article in the Daily News, Mr. Sanchez-Dorta submitted in Queens Supreme Court an Emergency Order to Show Cause to vacate an eviction pursuant to CPLR 5015(a)(3) (fraud, misrepresentation or other misconduct of an adverse party) because of his determination that a fraud of the type mentioned in the Daily News had occurred. Prior to, and during the filing of these papers, Mr. Sanchez-Dorta was forced to endure the ridicule of opposing counsel and even the landlord tenant judge, who even disparagingly inquired as to where Mr. Sanchez-Dorta had received his law degree, and was forced to endure various threats about financial sanctions (as he has had to endure ridicule and threats regarding financial sanctions in the instant action).

129.    Nevertheless, more than four years later, the authorities have begun to catch on to the fraud that Mr. Sanchez-Dorta pointed to several years before and Mr. Sanchez-Dorta believes that the same will occur regarding the instant action

and believes, thus, that it is necessary to put a stop to Defendants' schemes now, to send a message, rather than later after hundreds and even thousands of persons have become victim to this type of scheme.

130.     . Given the various doubtful judgments involved, that will be paid because of the Receivership (approximately $900,000 to the Defendant Bank of New York), $80,000 to Defendant Glenda Charles, $250,000 to Defendants Levitt & Kaizer) and given the amounts to be paid to the Receiver, Paul Shneyer who Judge Braun admits knowing from his days in politics in the amount of 180,000, and to the real estate broker in the amount of 180,000 (and these are all numbers presented at a settlement conference in the state court by Peter Dawson, counsel to various Defendants in this case),, it is not implausible that a conspiracy, in violation of the civil provisions of the RICO act would exist.

131.     Where else might a group of people so easily divide $1.5 million at the cost of a few telephone calls, and some motion practice, especially when it is so unlikely that another attorney would be so foolhardy to defend the case of a "convicted felon". After all, who do corrupt police officers steal from? Drug dealers and other criminals because they are unlikely to be able to have meaningful recourse to the courts. But if $1.5 million dollars disappeared from a drug bust, and preliminary evidence (without the benefit of an exhaustive investigation) suggested the $1.5 million was taken by police officers and their friends (political or otherwise), wouldn't a court be inclined to agree that there might very well exist a conspiracy that was worthwhile for the guilty parties to make the effort to have engaged in, making it worthwhile for the court to further

investigate? Now, would the Court not be willing to take a closer look at an appropriation of $1.5 Million when the fellow being appropriated from is not a drug dealer, the funds are not from drug dealing, yet the fellows accused of attempting to appropriate the funds are lawyers, law clerks, etc.?

132.    On January 28, 2016, upon motion by Plaintiff and his attorney, Mr. Sanchez-Dorta, Judge Braun recused himself from the matter in the state court, after initially seeming to suggest in a court appearance on December 15, 2015, when the motion was initially filed, that he would not recuse himself.

133.    Significantly, moreover, when he presented his decision to recuse himself, Judge Braun requested clarification of the point made by Mr. Sanchez-Dorta that the rent rolls from the building were necessary for Mr. Charles to pursue his federal case. Mr. Sanchez-Dorta interpreted this as an attempt to have Mr. Sanchez-Dorta admit that he was paid by funds that should have gone to the Receiver, Defendant, Paul Shneyer and, thus, should be "clawed back" from the receiver. This belief was based upon Mr. Sanchez-Dorta's view that this was in line with the strategy that Defendants have often used to dissuade Mr. Sanchez-Dorta from representing Mr. Charles: offering "Silver" (as in the comment by Defendant Kern-Rappy that "you could make money on this" and, when that failed, to offer "Lead" (threats to request financial sanctions against Mr. Sanchez-Dorta personally), which is a strategy commonly used by criminals such as drug dealers in South America to force their target to comply with their requests.

134.    For example, when Mr. Sanchez-Dorta refused to participate in their scheme to "make money", as presented by Defendant Kern-Rappy, and rather,

drafted a Federal Complaint, Defendant Pollock, Defendant Levitt & Kaizer, Defendant Levitt and Defendant Kaizer sent a letter to Mr. Sanchez-Dorta threatening that, as a part of their motion to dismiss the Federal Complaint, they would request sanctions personally against Mr. Sanchez-Dorta. Ultimately, Defendant Pollock, Defendant Levitt & Kaizer, Defendant Levitt and Defendant Kaizer filed their motion to dismiss, but although they threatened to request sanctions at a later date, did not request sanctions, very likely because they were aware that a frivolous request for sanctions might be viewed as what it was – an attempt to intimidate an attorney from defending his client from an asset steal that has been orchestrated by them with the assistance of the New York State Supreme court.

135.     On January 19, 2016, after attending a court appearance before Judge Braun's court, at which point Mr. Sanchez-Dorta was once again threatened with sanctions by opposing counsel (after opposing counsel had failed to follow through with its previous threat to request sanctions), and Judge Braun refused to recuse himself from handling the matter (he ultimately recused himself on January 28, 2016), at which appearance opposing counsel and the court once again pressured Mr. Sanchez-Dorta to force him to pay any rents received from the Premises to the Receiver, Mr. Paul Shneyer, to avoid motion practice for contempt of court (at which time Mr. Sanchez-Dorta informed those present at the court conference that, since the rents were Mr. Wayne Charles primary source of income, that they were forcing him to choose between eating and being held in contempt of court), Mr. Sanchez-Dorta visited the New York County Clerk's

Office to investigate any cases against Mr. Charles.

136.     While there, Mr. Sanchez-Dorta reviewed a separate foreclosure case, Emigrant Savings Bank v. Wayne Charles, New York Supreme Court County Index Number 81011/2012 and discovered things about that case which, quite frankly, perplexed him. The printout of that case, on January 19, 2016, reveals that there are two documents that have been scanned and filed in that case. The first is a notice, dated 10/16/2014, which states that the matter has been discontinued without prejudice, and the second is a judgment signed by New York State Supreme Court Judge Carol E. Huff on *March 6th, 2015*, which states, in sum and substance, that Mr. Charles that a property owned by Mr. Charles is to be sold at foreclosure because Mr. Wayne Charles owes Emigrant Bank $741,767.48 plus the contract default rate of 16% per annum. When Mr. Sanchez-Dorta inquired Mr. Wayne Charles about this debt, he informed him that the property had been sold and the debt had been paid at the closing.

137.     Investigations about why a judgment was attempted to be filed on March 6th, 2015, which judgment contains the signature of a New York State Supreme Court Judge, in a case that had been dismissed without prejudice approximately 9 months before, on October 16, 2014, regarding a property that was already sold after satisfaction of the debt, are ongoing. Fortunately, it seems that the Clerk of the Supreme Court was unwilling to file the judgment in its form, very likely because it had noticed the odd inconsistencies (a matter dismissed without prejudice cannot be revived by a judgment without further paperwork) and labeled the document as an "Unfiled Judgment", stamping the judgment with a

statement that "This Judgment has not been entered by the County Clerk and notice of entry cannot be served based hereon. To obtain entry counsel must appear in person at the Judgment Clerk's Desk".

138.    Now, was the Judge Carol E. Huff bribed to sign this document, or was the Judge simply duped, and by whom? These are matters that can only be determined via discovery. The question of "by whom" will likely be answered by the inquiry of the learned Cicero, "Cui Bono?", who benefits?"

139.    It seems that no attorney was so foolhardy as to appear in person at the Judgment Clerk's Desk, and although investigations regarding who submitted the judgment to the Judge Carol E. Huff for her signature, and who attempted to file the judgment with the Clerk of New York County, Supreme Court of the State of New York are ongoing, there seem to be one of two potential scenarios: a) Emigrant Bank and its attorneys are attempting to double dip, or b) Defendants and their allies attempted to file a judgment in a dismissed matter to increase the amount of Plaintiff Wayne Charles debt, thus, boosting the appearance that a Receivership was the only way to protect Mr. Charles creditors (a receivership based upon a $1.5 Million debt [regardless of the fact that the majority of that debt is in doubt] against a property worth approximately $3 Million is a harder sell than a receivership based upon a $2.25 Million debt).

140.    It seems that the latter is the likely scenario. One can only imagine what other revelations will appear as this matter develops in the face of threats against Mr. Sanchez-Dorta to drop his prosecution of the matter.

141.    Curiously enough, the very Affirmation of Lee Pollock in Support of

CPLR 5228 Motion for Appointment of Receiver, dated March 26, 2015, states that "5. *On March 6, 2015* a Judgment and Lien search was obtained for Judgment Debtor Wayne Charles…" [emphasis added]

142.      It is likely no coincidence that, the very day Defendant Lee Pollock submitted a judgment and lien search against Plaintiff Wayne Charles, *March 6, 2015*, a faulty judgment (which the county clerk was ultimately unwilling to file) was submitted to a New York Supreme Court judge for her signature.

## AS AND FOR A FIRST CAUSE OF ACTION
### Conduct and Participation in a RICO *Enterprise*
#### through a *Pattern of Racketeering Activity*:
#### 18 U.S.C. §§ 1961(5), 1962(c), 1964 (c)

143.　　Plaintiff(s) now re-allege each and every allegation as set forth above, and

hereby incorporate the same by reference, as if all were set forth fully herein.

144.　　This Court has original jurisdiction pursuant to the civil RICO remedies at

18 U.S.C. 1964, and the holdings of the U.S. Supreme Court in <u>Tafflin v. Levitt</u>,

493 U.S. 455 (1990).

145.　　At various times and places partially enumerated above, all Defendants

did associate with a RICO *enterprise* of individuals who were associated in fact

and who engaged in, and whose activities did affect, interstate and foreign

commerce.

146.　　If any of those Defendants could be termed the ringleader(s) of said RICO

*enterprise* of individuals who were associated-in-fact, it would be attorneys

Defendant Mr. Levitt and Defendant Mr. Kaizer and/or their law firm, Defendant

Levitt & Kaizer.

147.　　This association-in-fact RICO enterprise possessed, without limitation, the

following three characteristics: (1) a purpose, (2) relationships among those

associated with the enterprise, and (3) longevity sufficient to permit these

associates to pursue the enterprise's purpose. *See Boyle v. United States*, 129 S.Ct.

2237 (2009).

148.　　Plaintiff(s) allege that in this association-in-fact RICO enterprise its

members shared the common purpose to utilize the mails and the New York State

legal system to overbill Mr. Charles and to seize control of the Premises through

the fraudulent obtaining of the Affidavit of Confession of Judgment, and to collect on judgments and/or mortgages which were uncollectable (including, without limitation, judgments and/or mortgages uncollectable in foreclosure courts) in which each member carried out its role in the enterprise, with Defendant Mr. Levitt and as the leader, and Defendant Mr. Kaizer and Defendant Lee Pollock as his second in command, and which enterprise operated over several years in order to complete its purpose.

149.    Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise (by* being employed by, associated with, operating and/or managing said enterprise) through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

150.    Also, with regard to Defendants who are attorneys, Plaintiff(s) allege that these Defendants may not claim that they were carrying out their duties in accordance with generally accepted standards of their profession and without knowledge of the RICO violations and can, based on the facts presented above, be considered operators or managers of a RICO enterprise and, thus, held liable under the statute.

151.    All Defendants did also during a period at least within the last ten years cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. § 1961(1)(A) (regarding an act or threat involving bribery and extortion chargeable under state law and punishable by imprisonment for more than one year), as well as 18

U.S.C. § 1961(1)(B) (18 U.S.C. § 201 - Bribery of Public Officials and Witnesses [relating to bribery]; 18 U.S.C. § 1341 - Frauds and Swindles [relating to mail fraud]; 18 U.S.C. § 1343 - Fraud by Wire, Radio or Television [relating to wire fraud]; and, separately, 18 U.S.C. § 1621, perjury by (a) testimony made under oath, (b) that was false, (c) material to the proceeding and (d) was made deliberately with knowledge that the information was false, and ;18 U.S.C.§ 1622, subornation of perjury, by acting to "procure another to commit perjury", and Grand Larceny in the First Degree: New York Penal Law 155.42, and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities) as set forth above.

152.     Plaintiff(s) further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*, including, without limitation, with regard to the threat to the force the sale of the Premises as discussed above.

153.     Plaintiff(s) also allege that they are not the only person that has been victimized by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons and will if permitted to continue to operate victimize other persons.

154.     Plaintiff(s) further allege that they suffered injury to their business or property, and such predicate acts of the racketeering activity as mentioned above were the proximate cause of such injury and/or damages.

155.     Plaintiff(s) allege that civil liability attaches to each Defendant on account

of the above, and that the enterprise is distinct from each Defendant person.

**AS AND FOR A SECOND CAUSE OF ACTION**
Conspiracy to Engage in a
*Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(d), 1964(c)

156.     Plaintiff(s) now re-allege each and every allegation as set forth above, and

hereby incorporate the same by reference, as if all were set forth fully herein.

157.     At various times and places partially enumerated above, all Defendants

did also conspire to conduct and participate in said RICO *enterprise* through a

*pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d). See

also 18 U.S.C. §§ 1961(4), (5) and (9).

158.     All Defendants did also during a period at least within the last ten years

cooperate jointly and severally in the commission of two (2) or more of the RICO

predicate acts that are itemized in the RICO laws at 18 U.S.C. § 1961(1)(A)

(regarding an act or threat involving bribery and extortion chargeable under state

law and punishable by imprisonment for more than one year), as well as 18

U.S.C. § 1961(1)(B) (18 U.S.C. § 201 - Bribery of Public Officials and Witnesses

[relating to bribery]; 18 U.S.C. § 1341 - Frauds and Swindles [relating to mail

fraud]; 18 U.S.C. § 1343; and, separately, 18 U.S.C. § 1621, perjury by (a)

testimony made under oath, (b) that was false, (c) material to the proceeding and

(d) was made deliberately with knowledge that the information was false, and ;18

U.S.C.§ 1622, subornation of perjury, by acting to "procure another to commit

perjury", and Grand Larceny in the First Degree: New York Penal Law 155.42,,

Radio or Television [relating to wire fraud]; and did so in violation of the RICO law at 18 U.S.C. 1962(d) as set forth above.

159.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*), including, without limitation, with regard to the threat to the force the sale of the Premises as discussed above.

160.     Plaintiff(s) also allege that they are not the only person that has been victimized by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons and will if permitted to continue to operate will victimize other persons, including, thousands of homeowners throughout New York State and the other states of the United States of America in which such a scheme for collecting on mortgages not able to be foreclosed upon might work.

161.     Plaintiff(s) further allege that they suffered injury to their business or property, and such predicate acts of the racketeering activity as mentioned above were the proximate cause of such injury and/or damages.

162.     Plaintiff(s) allege that civil liability attaches to each Defendant on account of the above, and that the enterprise is distinct from each Defendant person.

163.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.

## AS AND FOR A THIRD CAUSE OF ACTION
*Fraudulent misrepresentation*

164.    Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

165.    At various times and places partially enumerated above, all Defendants did also intentionally misrepresent material facts.

166.    As more fully discussed above, Plaintiff(s) relied on these misrepresentations, including, without limitation, the threat that Defendant Levitt could easily withdraw from representing Mr. Wayne Charles at his criminal trial in the last few days of the trial if Mr. Charles did not sign the judgment, and misrepresentations from Defendant Glenda Charles regarding the amounts due to her, in violation of laws against perjury, leading to the execution of the Affidavit of Confession of Judgment, which fraud was finally consummated by the submission of the Defendants of fraudulent papers in a New York State Court to force the Premises into receivership, (including, without limitation, the attempt to secure on March 6th, 2015 [before the expiration of any relevant statute of limitations] of a New York State judge signature on a judgment in a foreclosure matter that had been dismissed and satisfied, and attempting to file the same with the county clerk) and Plaintiff(s) were harmed by the Defendants' misrepresentations.

167.    Defendants also, among other things, intentionally withheld the Motion to Receiver until they believed the statute of limitations had expired, misrepresenting their intent with regard to the use of the fraudulently obtained Affidavit of Confession of Judgment, they knew that Mr. Charles would rely upon

this intentional misrepresentation by failing to initiate a preemptive lawsuit against them for fraud and/or Civil Rico, and Mr. Charles relied on their misrepresentation to his detriment, and suffered damages.

168. Defendants also, among other things, intentionally misrepresented their relationship to one another, and the fact that they were working in conspiracy with one another and others to force the Premises into receivership, they knew that Mr. Charles and his counsel would rely upon this intentional misrepresentation by failing to initiate a preemptive lawsuit against them for fraud and/or Civil Rico, and failing to take other actions potentially available to defend Mr. Charles which he would have taken had he had concrete evidence of this conspiracy, and Mr. Charles relied on their misrepresentation to his detriment, and suffered damages.

169. Plaintiff(s) have been significantly damaged by those Defendants' fraudulent misrepresentations.

170. Further, Defendants have profited or will profit from their fraudulent misrepresentations and, accordingly, Plaintiff is entitled to disgorgement of those profits attributable to the fraudulent misrepresentations, in an amount to be determined at trial, but believed to be in excess of $4 Million, which amount includes both the value of the Premises, and other damages.

171. Further still, as Defendants conspired in their fraudulent misrepresentations, those Defendants acted with actual malice involving an intentional wrongdoing, or their conduct amounted to a wanton, willful or reckless disregard of Plaintiff(s)' rights.

172. Accordingly, Plaintiff(s) are entitled to treble damages and punitive

damages in an amount to be determined at trial.

173.     Thus, Plaintiff is entitled to actual damages in an amount to be determined at trial but believed to be in excess of $4 Million, to disgorgement of those profits attributable to the fraud, in an amount to be determined at trial but believed to be in excess of $4 Million, and to punitive damages and treble damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Civil conspiracy to Defraud and Commit Grand Larceny

174.     Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporates the same by reference, as if all were set forth fully herein.

175.     At various times and places partially enumerated above, all Defendants did also intentionally conspire to defraud Plaintiff(s), through a corrupt agreement between two or more persons, as more specifically described above, a number of overt acts, as more specifically described above, in furtherance of that agreement, with those Defendants' intentional participation in the furtherance of a plan or purpose to unlawfully secure the receivership of the Premises, which conspiracy did in fact lead to the receivership of the Premises, to attempt to secure the incarceration of Mr. Charles in order to more easily carry out their plan, and to attempt to collect on overbilled and unearned legal fees, thus resulting in damages to the Plaintiff(s).

176.     Moreover, all Defendants had an awareness of the effects in New York of their activities to defraud Plaintiff(s), the activity of the co-conspirator Defendants in New York was to the benefit of the out-of-state conspirator Defendant Ms.

Glenda Charles; and the co-conspirator Defendants acting in New York acted on behalf of the out-of-state Defendants.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION – 42 U.S.C. SECTION 1983 (DUE PROCESS)

177. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

178. As the proximate result of the Defendant's acts and/or omissions, Plaintiff(s) have been deprived of their right to due process as protected by the Fourteenth Amendment to the United States Constitution.

179. In particular, Defendant Kern-Rappy has participated in an effort to despoil Plaintiff Wayne Charles of his primary asset, the Premises, by attempting to bribe or otherwise influence his attorney to abide by a scheme to force the Premises into Receivership based on a number of debts the legality of which were in question, including an alleged debt to the Bank of New York (which had not been foreclosed upon, very likely because the Bank of New York could not legally foreclose on the same), a debt to a former spouse (which has been, in violation of the laws against perjury, drastically exaggerated), a debt to former counsel which raised a whole host of doubts and should have been reported to the Grievance committee by Defendant Kern-Rappy and/or her Judge, Judge Braun, but were not, and to have the judge for whom she works, Judge Braun, to threaten Plaintiff Wayne Charles' attorney, Mr. Sanchez-Dorta, so that he would desist from pursuing the case against her and the other Defendants.

## AS AND FOR A SIXTH CAUSE OF ACTION - MUNICIPAL LIABILITY FOR CONSTITUTIONAL VIOLATIONS – MONELL CLAIM AGAINST DEFENDANTS KERN-RAPPY AND THE STATE OF NEW YORK – 42 U.S.C. SECTION 1983

180. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

181. The State of New York directly caused the Constitutional violations suffered by Plaintiff(s), and are liable for the damages suffered by Plaintiff(s) as a result of the conduct of the Defendant court personnel.

182. The conduct of the Defendant court personnel was a direct consequence of policies and practices of the State of New York.

183. At all times relevant to the Complaint the State of New York had in place policies, practices and customs that condoned and fostered the unconstitutional conduct of the individual Defendants and were the direct and proximate cause of the damages and injuries complained of herein.

184. At all times relevant to the Complaint the State of New York had in place policies, practices and customs that condoned and fostered the failure of Defendant Ms. Kern- Rappy to properly execute her responsibility as an officer of the court.

185. The wrongful polices, practices, customs and/or usages complained of herein demonstrated a deliberate indifference on the part of policymakers of the the State of New York to the Constitutional rights of persons within the City and the State of New York, and were the direct and proximate cause of the violations of Plaintiff's rights herein.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### *Injunctive relief*

186.    Plaintiff(s) now re-allege each and every allegation as set forth above, and

hereby incorporate the same by reference, as if all were set forth fully herein.

187.    Plaintiff(s) faces irreparable harm if an injunction is not granted against

the Defendants, and/or the Receiver they were able to have appointed by Judge

Braun's court, Paul A. Shneyer, transferring the Premises to a *bona fide* purchaser

or otherwise carrying out his obligations as a Receiver.

188.    Plaintiff(s) will have no adequate remedy at law if the Premises are

transferred by the Defendants, and/or the Receiver they were able to have

appointed by Judge Braun's court, Paul A. Shneyer, to a *bona fide* purchaser, or

the Receiver Mr. Paul A. Shneyer is otherwise permitted to carry out his

obligations as a Receiver.  Money damages attributable to Defendants' and/or the

Receiver they were able to have appointed by Judge Braun's court, Paul A.

Shneyer's sale of the Premises to a *bona fide* purchaser, or the carrying out of any

other obligations of the Receiver with regard to the Premises are difficult to

calculate, and such money damages are likely to be inadequate.

189.    Plaintiff is entitled to a mandatory permanent injunction ordering that the

Defendants and their agents, employees, or other representatives (including the

Receiver they were able to have appointed by Judge Braun's court, Paul A.

Shneyer: (1) be prohibited from transferring the Premises to a *bona fide*

purchaser, (2) be prohibited from carrying out any other acts as Receiver,  (3) be

informed that failure to comply with this Court's order shall be punished as

contempt of court.

## PLAINTIFF(S) DEMAND A TRIAL BY JURY

1. Plaintiff(s) hereby demand a trial by jury in this action.

## RELIEF REQUESTED

WHEREFORE, Plaintiff(s) pray for judgment against Defendant(s) and asks this Court to:

1. Award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $4,000,000, including treble damages and punitive damages where warranted.

2. Award the Plaintiff(s) injunctive relief as described above.

3. Award the Plaintiff(s) attorney's fees, disbursements, costs, and interest; and

4. Grant the Plaintiff(s) such other and further relief as the Court may deem just and proper.

February 3, 2016

_____
J.A. Sanchez
The Law Office of J.A. Sanchez-Dorta, P.C.
225 Broadway
Suite 1901
New York, NY 10007
(646) 657-5345
(646) 390-3214 (fax)
Attorney Bar Code JS3070

Counsel for Plaintiff(s)

## VERIFICATION

STATE OF NEW YORK

COUNTY OF NEW YORK

WAYNE CHARLES, being duly sworn, deposes and says:

I am a Plaintiff in the within action.

I have read (or have read to me) the foregoing Complaint and know the contents thereof.

That same is true to my knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

WAYNE CHARLES

Sworn to before me this

3rd day of February, 2016

NOTARY PUBLIC

**SHAWN A TURCK**
Notary Public, State of New York
No. 02TU6217040
Qualified in Queens County
Commission Expires March 15, 2018